G. G. COUNCIL, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, January 14, and March 4, 1907.

1. COMMON CARRIERS: Exposing Stock to Disease: Petition. A petition is held to state a cause of action against a common carrier for the wrongful act of knowingly exposing certain hogs while in transit to a dangerous disease.

2. ———: Person in Charge of Train: Vice-Principal. A person in charge of a train in the switch yards whether called conductor, foreman or yardmaster is a vice-principal.

3. ———: Evidence: Conclusion: Knowledge. When a witness possesses knowledge of primary facts which certainly imply the existence of another fact, he may testify to such other fact as of his own knowledge as for instance that a person in actual charge of a train was a conductor and it may be shown on cross-examination or otherwise that the witness's knowledge was defective.

4. ———: ———: ———: ———. And so witnesses who were in a position to observe surrounding physical conditions may state that a car of hogs could be moved to a certain point without being taken to a certain other point.

5. EVIDENCE: Exposing Hogs to Disease: Communicating Disease. Where the issue was whether the plaintiff's hogs had been exposed to a contagious disease facts tending to show that they communicated the disease to other hogs were admissible.

6. ———: Expert: Value of Hogs: Record of Animal. Where a witness who is an expert fixes the value of a hog at a given sum he may further state the record of that animal as a prize winner at fine stock shows, since such fact is as material as those relating to physical action, size, form, etc.

7. ———: Hearsay: General Reputation: Recent Existence of an Infectious Disease. The law relating to the competency of general reputation is reviewed and held not to apply to the recent existence of an infectious disease at a given point where such fact could be shown by direct testimony.

8. COMMON CARRIERS: Exposing Hogs to Disease: Pleading: Instruction. Under the pleading it is held that the precise name of the lethal malady communicated by the carrier to the plaintiff's hogs is unimportant but the gravamen of the action is that the hogs became infected with a virulent disease and the criticism of an instruction because of the words, "or other infectious disease" is held to be hypercritical.

9. ———: ———: "Infectious:" "Contagious:" Pleading: Instruction. Under the pleading it was immaterial whether hog cholera is infectious or contagious and an instruction assuming that it was infectious was not error.

10. ———: ———: Evidence: Instruction. As to whether the evidence shows that the defendant exposed the plaintiff's hogs to an infectious disease was properly treated as a question for the jury.

11. ———: ———: Incident of Transportation. Because a shipper knew that the stock yards at Kansas City were infected with hog cholera he did not thereby assume the risk of his hogs being exposed to such disease when he did not ship to that

part of the stock yards but to an entirely different portion and he had a right to expect that the carrier would use all reasonable means to protect his hogs against injury from a known danger.

Appeal from Henry Circuit Court.—*Hon. W. W. Graves,* Judge.

AFFIRMED.

*L. F. Parker, John H. Lucas* and *Charles A. Calvird* for appellant.

(1) The court erred in admitting evidence of G. G. Council, George W. Jessop and T. A. Harris. The evidence relating to conversations with third parties; to matter not involved in the pleadings, and incompetent. Lester v. Railroad, 60 Mo. 267; King v. Railroad, 98 Mo. 240; Brooks v. Blackwell, 76 Mo. 310; Ritter v. Bank, 87 Mo. 575; Gorham v. Auerswald, 53 Mo. App. 134; Trust Co. v. Lumber Co., 118 Mo. 462. (2) The court erred in refusing to admit the testimony of B. N. Brown and C. E. Exline. This evidence was to show, by general repute, the existence of cholera in the pavilion. Peniston v. Schlude, 171 Mo. 141; Drumm Co. v. Bank, 107 Mo. App. 436. (3) The court erred in giving instructions asked by plaintiff—(a) Enlarges the issues: Bank v. Armstrong, 62 Mo. 65; Christian v. Ins. Co., 143 Mo. 469; Haines v. Pearson, 100 Mo. App. 555; Johnson v. Bank, 102 Mo. App. 400; Wolfe v. Supreme Lodge, 160 Mo. 686; Minnier v. Railroad, 167 Mo. 114. (b) Assumes controverted facts, "cholera infections." Grayson v. Lynch, 163 U. S. 468; Day v. Railroad, 81 Mo. App. 484; Dean v. Woodenware Co., 106 Mo. App. 186; 1 Blashfield's Instructions, sec. 29; State v. Bonner, 178 Mo. 432; Heinzle v. Railroad, 182 Mo. 559; Veatch v. Norman, 109 Mo. App. 395; Link v. Westerman, 80 Mo. App. 596; May v. Crawford, 150 Mo. 528; Boothe v. Lay, 83 Mo. App. 607; Koenig v. Depot

Co., 173 Mo. 724; Chitty v. Railroad, 148 Mo. 74. (c) Comment on evidence. State v. Rutherford, 152 Mo. 133; State v. Grogin, 147 Mo. 55; McFadin v. Catron, 120 Mo. 274; Shawhan v. Transit Co., 109 Mo. App. 233; Swink v. Anthony, 96 Mo. App. 426; Rothschild v. Ins. Co., 62 Mo. 361. (4) The court erred in refusing to give instructions asked by appellant, which were in accord with the pleadings and evidence, and ought to have been given. O'Donnell v. Patton, 117 Mo. 21; Havens v. Railroad, 155 Mo. 216; Hite v. Railroad, 130 Mo. 141; Estes v. Shoe Co., 155 Mo. 587; Schereth v. Railroad, 96 Mo. 515.

*C. D. Corum, C. C. Dickinson* and *Parks & Son* for respondent.

Submitted an argument.

JOHNSON, J.—Action by a shipper of live stock against a common carrier to recover damages resulting from the alleged wrongful act of the carrier in knowingly and against the protest of the shipper exposing the animals during the transportation to a virulent disease from which fifteen of them sickened and died. The judgment was for plaintiff in the sum of $4,500 and defendant appealed.

On October 14, 1902, plaintiff, a breeder of fine hogs, shipped twenty-six head of thoroughbred Berkshire hogs from Williamsville, Illinois, to Kansas City for the purpose of placing them on exhibition at a fine stock show. The shipment was made over the Chicago & Alton Railroad and the bill of lading issued designated the "Fine Stock Pavilion, Kansas City, Missouri," as the place of delivery. This railroad runs to Kansas City, but has no tracks reaching the stockyards, the place where the show was to be held. The defendant company, which maintains and operates tracks into the stockyards re-

ceived the car containing plaintiff's hogs from the initial carrier at Kansas City and undertook for a consideration to deliver it at the destination fixed in the shipping contract. The show grounds were situated on property of the stockyards company, but were detached from the pens and yards used in the regular business of that company. After receiving the car containing plaintiff's hogs defendant made up a train consisting of that car, another car of fine hogs and five cars of cattle. The cars of hogs were placed next the engine and the train was backed towards the stockyards. When it reached a point where the track divided into three branches it stopped for a few minutes. One of the tracks into which the main line separated went directly to the unloading platform at the fine stock pavilion and another went in a different direction to and by the hog pens used in the regular business of the Stockyards Company. Plaintiff and other owners of the fine hogs in the two cars knew of the presence of hog cholera and other virulent diseases in and about these hog pens and their unloading platforms and, learning that the trainmen purposed switching their cars into the infected district before delivering them at their place of delivery, protested to the person who appeared to be in charge of the movements of the train against this course, and informing him of the danger of exposing the hogs to these diseases asked him to deliver the two cars of hogs at the pavilion before proceeding with the other work in hand. This could have been done with little trouble, but the request was refused and the two cars were taken into the infected district and left standing there for more than half an hour. They were then run back to the junction and switched to their destination. The hogs were unloaded, placed on exhibition where they remained during the continuance of the show, after which they were reloaded, billed back to Williamsville over the same route and delivered to defendant. Again over the objections of

plaintiff and the other shippers, defendant's employees switched the cars back into the infected district and permitted them to remain standing there a considerable time before they were moved to the yards of the Chicago & Alton Railroad. There was no necessity for either exposure, but the cars could have been handled to avoid coming into the zone of danger. On account of the value of the animals, great care had been observed by plaintiff in their shipment. The car used had not been employed before in the shipment of hogs and had been thoroughly disinfected. When the hogs arrived at Kansas City, they were in good health and apparently free from disease. Immediately after their return to Williamsville, plaintiff, fearing they had become diseased on account of their exposure, placed them in quarantine on his farm. Cholera or some other fatal disease appeared among them in a short time and resulted in the death of fifteen.

The foregoing facts are collected from the evidence introduced by plaintiff. Other facts material to the particular issues before us will appear in the discussion of the errors assigned. The petition embodies the facts above stated and the cause of action asserted is the wrongful act of knowingly exposing the property to unnecessary danger. The answer tenders the general issue and in addition contains the allegation, "that if the plaintiff suffered any loss at the time mentioned in the petition, which it denies, then it was on account of his own negligence in shipping his stock to the stockyards at Kansas City and was a risk assumed by him in so doing with knowledge of the conditions at the time."

First, we will dispose of objections made to the rulings of the learned trial judge in admitting and rejecting evidence offered. Plaintiff in testifying concerning the movement of the train into the stockyards said in part, "They switched us straight away down in the main stockyards; and I asked the man in charge—he had no uni-

form on; I knew him no more than the man in charge of the train; I suppose he was a brakeman, foreman or something; I didn't know in what capacity he was, only he was in charge of the train—where he was going to take us. He said they were going down in the yards to unload some stock. Q. Now what did they do then? A. I told them that I didn't want to go down in the stockyards with my hogs. Defendant objects to this conversation for the reason it is not shown to be with anybody in authority. Objection overruled and defendant excepted. Q. (Court) He said it was a man in charge of the train. A. I said that he should not take us down there and he paid no attention to what I said to him; and I says—talked as nice as I could to him—that he should not take us down there. I told him the yards were infected with disease and if he took us down there he would expose our hogs to disease," etc. The person in control of the movements of that train by whatever name he was called—conductor, foreman or yard boss—was the vice-principal of his master, the corporation, and notice to him was notice to the corporation. [Merchants Bank v. Lovitt, 114 Mo. 525; 3 Clark and Marshall on Corporations, secs. 718, 719; Mechem on Agency, sec. 729.] It is urged, however, the statement that " he was the man in charge" is a mere conclusion and not the statement of a fact. A witness for plaintiff testified without objection that this conversation was held "with the man in charge of the train." Another witness that it was with "the man that was taking care of us and moving our car. Q. In charge of the train? A. Yes, sir." And another witness testified as follows:

"Q. Which one of the trainmen was it that he was talking to? A. I don't know, it was the fellow that seemed to be the boss, foreman or something—conductor." . . . Q. Did the man in charge when you talked to him, do you recollect whether or not he said what he was going down into there for? A. I think

he said he had some switching to do down in there and they were going to do it to the best of their advantage."

A fundamental rule of evidence is that a witness must testify to facts in his own knowledge as distinguished from those that come to him by hearsay or from opinions and conclusions he reaches by a process of reasoning or conjecture from known facts and circumstances, which of themselves do not necessarily lead to the opinion or conclusion reached. But it does not follow that because a given fact must be deduced from other facts and circumstances, it should be classified as a conclusion or matter of opinion. There are facts which so certainly follow other facts that all reasonable minds presume the existence of the one from that of its basic facts and when the witness possesses knowledge of such primary facts, their resultant fact is presumed to be within his knowledge though it may require a process of reasoning to place it there. The principle may be illustrated by this example. A passenger boards a train at a regular station. He sees a person standing at the conductor's post in uniform and wearing a cap bearing the word "Conductor" on its front. He sees this person give a signal to start the train and observes the train start in response thereto. Then he notices the person come into the car and collect tickets from the passengers. In short, he observes him performing all of the acts and duties of a conductor and naturally infers that he is the conductor in charge of that train. Afterwards, on the witness stand, he is asked, "Who collected your ticket?" and answers, "The conductor." He has not been asked questions that disclose his means of knowledge and an objection similar to the one before us is interposed to the testimony. In passing on the competency of the evidence, we begin with the rule that, "Where nothing appears to the contrary, it is to be presumed that what the witness stated was within his knowledge and that

his knowledge was derived from proper sources." [1 Wigmore on Evidence, sec. 654.] And observing that the witness as a passenger on the train was in a position to know who was performing the duties of the conductor, we assume, nothing to the contrary appearing, that he had accurate means of knowledge and, therefore, reach the conclusion that the objection should be overruled. The safeguard against being imposed on by hearsay or opinion evidence lies in cross-examination. Continuing with the example, let us suppose that counsel for the defendant ask and obtain leave to cross-examine the witness touching his means of knowledge. Should it appear that they were inadequate, the testimony should be stricken out. On the other hand, should the witness detail facts and circumstances showing that the person he assumed to be the conductor was performing the duties of that position and bore the appearance of authority, the evidence would be competent though the witness admitted his means of knowledge were confined to what he observed while a passenger on the train.

Any reasonable person would presume that the man in actual charge of the train as conductor had been placed there by the orders of the carrier and in such case the burden would be on the carrier to show that a person actually in charge of one of its trains was in fact an interloper. The terms "conductor" and "man in charge of the train" should be treated as synonymous. Plaintiff being on the train and in a position to observe who was directing its movements, should be presumed to know who that person was. The question and answer embodied the statement of a fact and not a conclusion and, as it was not shown by cross-examination or otherwise that the witness' means of knowledge were defective, it was proper to permit the testimony to stand. The principles stated apply to other similar objections urged by defendant.

Certainly it was competent for the witnesses of

plaintiff, who were in a position to observe the sur-
rounding physical conditions, to state that the cars of
hogs could have been moved to and from the fine stock
pavilion without being taken into the stockyards proper.
[Standley v. Railway, 121 Mo. App. 537.]   Indeed, this
fact, in effect, is admitted by defendant's witnesses.   The
foreman of the train, a witness for defendant testified:

"Q.   Was there anything to prevent you from tak-
ing these cars down and coming back and taking the
other cars?   A.   Why, if the yard master had directed
me to I would have done it.   Q.   What was to hinder
you from running down on the hay barn switch (the
track to the pavilion) in place of running down to track
nine?   A.   I was directed to put them on track nine."

It appears from all of the testimony that there were
no physical obstacles to prevent the switching of the
hog cars to the pavilion and that the other course was
pursued as a mere matter of convenience.   In such state
of proof, the error, if one had been committed, would
have been harmless and would not suffice to warrant a
reversal of the judgment.

Another objection is directed against the admission
of plaintiff's testimony that some hogs of his other than
those involved in this suit were accidentally exposed to
infection by the hogs in controversy after their return
to plaintiff's farm and died from the same disease that
caused the death of the hogs in suit.   The testimony is
as follows:

"A.   When I was preparing my quarantine district
for these hogs, I removed a number of sows and pigs,
they would average from forty to seventy-five or eighty
pounds.   I moved them to another place half a mile away
and in a day or two after they were removed, the pigs
got out, about thirty or forty of them—got back to this
place in the quarantine—.

"Counsel for defendant.   We object to that, there is
no controversy about that.   Objection overruled.   A.   I

lost out of that bunch of pigs, there were probably thirty-five of them, I don't just remember, I lost twenty of them."

The argument is that evidence of the effect of this exposure on animals not involved in this suit is extrinsic to the issues presented by the pleadings and therefore inadmissible. Care always should be observed to avoid going into the investigation of collateral issues; first, because the adverse party is not advised by the pleadings to meet any other issues than those therein presented; and second, because extraneous issues needlessly consume the time of the court and have a tendency to obscure the real issues and thus confuse the minds of the jurors. But facts or circumstances, upon which a reasonable inference may be founded as to the truth or falsity of a disputed fact which is elemental to the cause of action, are not extrinsic, but are germane to the issue. Plaintiff had the burden of showing to the satisfaction of the jury: first, that his hogs were exposed to a virulent and contagious or infectious disease through the wanton or negligent act of defendant; and second, that such exposure was the direct cause of the death of the animals. To maintain his case, he could not leave the cause of the injury in the field of conjecture and speculation, but had to produce facts and circumstances which, if believed to exist, would point with reasonable certainty to the wrongful act of defendant as the producing cause of the injury. Defendant contended: first, that the hogs were not and could not have been infected with cholera from the exposures at the stockyards; and second, that they did not die of this disease. Evidence that they communicated the disease to other hogs would justify the inference that they were afflicted with the disease they communicated and consequently it had a direct, and not a merely collateral bearing, on a vital issue. [1 Wigmore on Evidence, secs. 38, 39.]

Another objection relates to the admission of evi-

dence touching the value of the hogs in controversy. Consideration of one of this class of objections will serve to dispose of all. Plaintiff testified that the market value of one of the hogs, "Baron Duke," was $1,000. He was then permitted to detail, over the objection of defendant, the record of the animal as a prize winner at various fine stock shows. Plaintiff's opinion as to value must be classed as expert evidence and, as such, was purely advisory, but the material facts on which the opinion was based, if found to exist, could not with propriety be disregarded by the jury in making up its estimate of value. The record of a thoroughbred animal is a fact as material to value as are facts relating to physical excellence, such as size, form, color, breeding capacity and the like. The fact was one the jury had a right to consider and, being such, there is no merit in the contention that its production in evidence should be regarded "as an attempt to bolster up plaintiff's opinion" of value.

Defendant complains of the rejection of evidence it offered to introduce, of which the following excerpt is a fair example: "Q. I will get you to state, Mr. Exline, whether you learned of the existence of cholera or diseased hogs in the pavilion at Kansas City during the time you were there. A. I only heard that it was. The court: You did not see any? A. No sir, didn't see any, I heard others say there was some sick hogs in the tent." On motion of plaintiff, the answer was stricken out. Defendant offered to show, "that it was currently reported immediately after the live stock show that there was a great deal of cholera among the hogs and that a great many of the hogs died of cholera." The refusal of the offer is the ground of the present objection.

Among the exceptions to the hearsay rule are those permitting certain facts to be shown by general reputation. In analyzing such exceptions, it will be found they are controlled by certain well-defined elementary rules.

In the first place, the law looks with disfavor on hearsay evidence because the party against whom it is given is deprived of the opportunity of confronting and cross-examining the person who uttered the fact as one within his own knowledge. Therefore, it may be stated as a rule that whenever a fact in issue may be adequately investigated by a judicial tribunal through the medium of evidence of witnesses, who can testify to facts and circumstances within their own knowledge, hearsay evidence should not be admitted. In other words, hearsay, being at best a base character of evidence, should not be received except in cases of real necessity and such necessity should apply to the class to which the case belongs as distinguished from a special need in a particular case. The necessity may result either from the general lack of other satisfactory evidence of the desired fact or from the practical impossibility of producing and investigating better evidence. Examples of the former class are ancient occurrences, events of general history, marriages, births, deaths and other facts of family history, old landmarks and boundaries, etc. Illustrative of the latter class, we will content ourselves with the instance of proving personal character. In impeaching the credibility of a witness, the test to be applied is his general reputation in the community for truth and veracity or chastity. The ultimate fact to be found is the real character of the witness in the respects mentioned, but because of the impracticability of making judicial investigation into all of the acts of his every-day life, we are forced to accept the results of his conduct on the minds of those among whom he is known and to adopt the consensus of general opinion as proof or disproof of the asserted fact.

Applying these principles to the question in hand, we do not think that the evidence offered should be classed with the exceptions to the hearsay rule. The fact asserted, i. e., that cholera existed in the fine stock

pavilion, was a recent occurrence; in its very nature, could not have been one of general public knowledge and its existence, if it did exist, could have been shown by facts and circumstances in the knowledge of witnesses. Indeed, defendant did introduce witnesses who testified that animals other than those contained in the two cars defendant switched into the infected district, which were on exhibition in the fine stock pavilion, immediately thereafter sickened and died from cholera or some other virulent disease, and it may be added that plaintiff did not controvert the fact that cholera did appear in the pavilion, but whether the germs of the disease were there before the advent of plaintiff's hogs or were brought there by them was a controverted issue. But, in any event, the report in circulation among exhibitors that cholera was present in the pavilion was devoid of probative value and the evidence was properly excluded. [1 Greenleaf on Evidence(16 Ed.), secs. 99, 100, 101. 2 Wigmore on Evidence, sec. 1580.]

Defendant criticizes this portion of the first instruction given on behalf of plaintiff, "And if you further find from the evidence that plaintiff's said hogs were thus exposed to said diseases and by reason of said exposure did contract and take hog cholera, or other infectious disease, and die therefrom," etc. First, it is said that the inclusion of the words "or other infectious disease" enlarged the scope of the cause of action pleaded in the petition. The petition does contain the allegation that the hogs "died of the cholera contracted at said stockyards," but the exposures are alleged to have been to "cholera or other infectious disease" and immediately preceding the allegation under consideration is the statement, "that they were so exposed, against the protest of plaintiff and that they were unnecessarily and wrongfully so exposed and by reason thereof contracted cholera or other infectious disease." The objection is too hypercritical to merit serious considera-

tion. No one can read the petition without understanding that the pleader intended to charge defendant with having wrongfully injured the animals by exposing them to the infection of cholera or some other fatal disease. The precise name of the lethal malady communicated is unimportant. It is no part of the cause of action. It is the fact that defendant wrongfully caused the hogs to become affected with a virulent disease, from which they suffered injury, that is the gravamen of the action.

Further objection is made to the instruction on the ground that it assumes as a matter of law that cholera is an infectious disease. All of the witnesses agree and, indeed, it is a matter of common knowledge that the disease is communicable. Some say it is contagious, others infectious, and still others that it is both. It is immaterial which is right. The admitted fact that the disease readily transmits itself excuses the use of the word infectious in describing that characteristic. It is true lexicographers and scientific persons observe a well-defined difference in the meanings of the words "contagious" and "infectious," but courts should be slow to predicate error on such technical distinctions and, unless it appears that the jury could have been misled by the inaccurate use of a word, it would savor of pedantry to quibble about it. Evidently, the word "infectious" was employed in the petition and instructions to express the property of transmissibility in the disease or diseases to which the hogs were wrongfully exposed and from which they died and, in this general sense, its use was proper in any aspect of the evidence.

Another point is, that the evidence of the plaintiff fails to show that the exposures in the stockyards were the producing cause of the injury. Expert witnesses for defendant testified that cholera germs are not transmitted by contact or exhalation, but by the contamination of food and drink. Plaintiff's witnesses say that the car with the doors open for ventilation was permitted

to stand in close proximity to the platform on which there was a number of hogs that had died of cholera and other diseases. Some of them were greatly swollen by corruption and all were swarming with flies; dirt and straw were scattered around them, some of which could have been carried into the car by currents of air. The facts and circumstances disclosed, considered in connection with the natural habits of swine, particularly their manner of taking food and drink, support a reasonable inference that the disease was communicated to them during these exposures. The manner of the dissemination of cholera germs is a subject about which the witnesses differ and certainly a court is not justified in assuming, as a matter of law, that they are not trans-. mitted by contact or exhalation. The issue was properly treated as one of fact for the jury.

Defendant further contends that, as plaintiff knew of the presence of cholera in the stockyards, he assumed the risk of their exposure when he made the shipment. Plaintiff did not ship his hogs to the commercial department of the stockyards, but to the show pavilion. Under his evidence, there was no necessity for diverting the car into the infected zone and therefore he was not required to anticipate that defendant, knowingly and in face of his protest, would deliberately take the car into the sphere of danger. On the contrary, he had the right to expect that defendant would exercise the degree of care exacted by law of common carriers in the transportation of property to employ all reasonable means to protect it against injury from known dangers.

Other points are made, but they do not appear to be of enough consequence to merit special notice. The petition discloses a cause of action, which is sustained in all of its essential features by the evidence adduced by plaintiff. We have carefully examined the instructions and find the issues were fairly submitted. The judgment is affirmed. All concur.